UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| C.C., through his natural mother and guardian, MELANIE GINNEVER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:16CV01271 ERW |
| SUZUKI MANUFACTURING OF AMERICA CORPORATION, et al., | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendants Suzuki Manufacturing of America Corporation and Suzuki Motor Corporation's Motion for Summary Judgment on All Counts of Plaintiff's Amended Complaint [110] and Defendants Suzuki Manufacturing of America Corporation and Suzuki Motor Corporation's Motion for Summary Judgment on the Issue of Punitive Damages [115].

**I.   BACKGROUND**

This lawsuit originated when Plaintiff C.C. ("Plaintiff") filed a complaint in the Eastern District of Missouri against Suzuki Motor of America, Inc. ("SMAI") and Suzuki Manufacturing of America Corporation ("SMAC"). On June 21, 2017, Plaintiff filed an amended complaint removing SMAI as a defendant and adding Suzuki Motor Corporation ("SMC"). In his amended complaint, Plaintiff alleged SMAC and SMC were negligent and the ATV sold by Defendants was in a defective condition and unreasonably dangerous when the left handlebar grip of a Suzuki ATV Plaintiff was driving came off, injuring Plaintiff. Defendants now seek summary judgment on all counts of Plaintiff's complaint and Plaintiff's claim for punitive damages.

1

A.  *Uncontroverted Facts*

At the time of the crash, on July 19, 2015, Plaintiff was 14 years old. ECF No. 114, ¶ 2, 141, ¶ 2. Plaintiff was operating a 2013 Suzuki KingQuad ATV ("Subject ATV") when he hit a tree root and tipped to the left. ECF No. 114, ¶ 2, 141, ¶ 2.

SMAI is a wholly-owned subsidiary of SMC. ECF No. 142, ¶ 5, 158, ¶ 5. SMAI is the sole distributor of Suzuki ATVs in the continental United States.[1] ECF No. 142, ¶ 6, 158, ¶ 6. SMAC is owned by two entities, SMC and SMAI. ECF No. 142, ¶ 7, 158, ¶ 7. SMC owns 20% of SMAC. ECF No. 142, ¶ 8, 158, ¶ 8. SMAI (which is owned 100% by SMC) owns 80% of SMAC. ECF No. 142, ¶ 9, 158, ¶ 9.

SMAC was responsible for the manufacture of the Subject ATV on June 22, 2012. ECF No. 114, ¶ 4, 141, ¶ 4. The Subject ATV weighed 615 pounds, and its tires were 25 inches tall. ECF No. 114, ¶ 4, 141, ¶ 4. SMC was responsible for the design of the Subject ATV. ECF No. 114, ¶ 5, 141, ¶ 5. On June 22, 2012, the Subject ATV was sold to American Suzuki Motor Corporation ("ASMC").[2] ECF No. 114, ¶ 7, 141, ¶ 7. On July 11, 2012, ASMC sold the Subject ATV to Big St. Charles Motorsports in St. Charles, Missouri. ECF No. 114, ¶ 7, 141, ¶ 7. In September 2012, Big St. Charles Motorsports sold the Subject ATV to the first original retail owner. ECF No. 114, ¶ 8, 141, ¶ 8. In December 2013, the first original retail owner traded it back to Big St. Charles Motorsports. ECF No. 114, ¶ 9, 141, ¶ 9. On January 18, 2014, Tom Jones, Plaintiff's uncle, purchased the Subject ATV from Big St. Charles Motorsports. ECF No. 142, ¶ 20, 158, ¶ 20. At the time of purchase, the Subject ATV had 311 miles on it. ECF No. 114, ¶ 11, 141, ¶ 11. In September 2015, the mileage meter registered 875 miles. ECF No. 114, ¶ 11, 141, ¶ 11.

---

[1] At the time the Subject ATV was sold, SMAI was not in existence. ASMC was the distributor.
[2] ASMC is no longer in business.

The warning labels on the Subject ATV at the time of manufacture warned: (a) to never operate the ATV if under the age of 16 years old; (b) to never carry passengers; and (c) to always use an approved helmet and protective gear while operating the ATV. ECF No. 114, ¶ 12, 141, ¶ 12. At the time of the crash, Plaintiff was under the age of 16 years old, carrying a passenger, J.J., neither of whom was wearing a helmet. ECF No. 114, ¶ 13, 141, ¶ 13. Plaintiff never reviewed the warnings on the ATV, in the Owner's Manual or in the Tips and Practice Guide. ECF No. 114, ¶ 14, 141, ¶ 14. Plaintiff's aunt, Christina Jones, taught him to operate the ATV but did not go over any of the warning labels or show him the owner's manual. ECF No. 114, ¶ 14, 141, ¶ 14.

A few days before the crash occurred, Plaintiff had gone to Tom and Christina Jones' property in Silva, Missouri. ECF No. 114, ¶ 15, 141, ¶ 15. The weekend of July 19, 2015, Plaintiff, along with his cousins, J.J. and A.J., rode the ATV, separately and in pairs, with the permission of Mr. and Mrs. Jones. ECF No. 114, ¶ 16, 141, ¶ 16. On the day of the crash, July 19, 2015, Plaintiff had ridden 20 times on the ATV. ECF No. 114, ¶ 17, 141, ¶ 17. The crash occurred in a creek bed on Mr. and Mrs. Jones' property. ECF No. 114, ¶ 18, 141, ¶ 18. Plaintiff and J.J. were the only witnesses to the crash. ECF No. 114, ¶ 18, 141, ¶ 18.

The boys began operating the ATV near the house and headed toward the creek bed. ECF No. 114, ¶ 19, 141, ¶ 19. Plaintiff testified he drove the ATV toward the creek at five miles per hour, with J.J. behind him on the seat. ECF No. 114, ¶ 20, 141, ¶ 20. He further testified, when they got to the top of the creek, he applied the brakes and entered the creek at two to three miles per hour. ECF No. 114, ¶ 22, 141, ¶ 22. Plaintiff testified he hit a rock in the creek with the ATV's left front tire, causing the ATV to go to the right. ECF No. 114, ¶ 24, 141, ¶ 24. He testified when he tried to straighten out the ATV, his right front tire hit and ramped over a tree

3

root. ECF No. 114, ¶ 24, 141, ¶ 24. The ATV tipped over onto its left side. ECF No. 142, ¶ 34, 158, ¶ 34. Plaintiff testified the left grip came off when the ATV tipped over. ECF No. 142, ¶ 36, 158, ¶ 36. He saw the left grip in his left hand and then blacked out. ECF No. 142, ¶ 37, 158, ¶ 37.

J.J. testified after the ATV entered the creek, he felt unsteady, closed his eyes, and jumped off the back of the ATV while it was still in the creek. ECF No. 114, ¶ 31, 141, ¶ 31. J.J. saw the left handlebar grip detached from the ATV, off to the side, on the ground. ECF No. 142, ¶ 42, 158, ¶ 42. He went to get help. ECF No. 142, ¶ 43, 158, ¶ 43. Mr. Jone's arrived to the scene shortly after and removed the Subject ATV off of Plaintiff. ECF No. 142, ¶ 44, 158, ¶ 44. When Mr. Jones pulled the ATV off of Plaintiff, he saw the handlebar come out of a hole in C.C's pants. ECF No. 142, ¶ 46, 158, ¶ 46. Mr. Jones thought the hole in Plaintiff's groin looked like the handlebar. ECF No. 142, ¶ 47, 158, ¶ 47. Blood started spurting out once the handlebar removed from Plaintiff's groin. ECF No. 142, ¶ 48, 158, ¶ 48. Mr. Jones or J.J. picked up the left grip and Mr. Jones slid it back on the ATV. ECF No. 142, ¶ 49, 158, ¶ 49. There was blood on the grip when it was put back on the ATV. ECF No. 142, ¶ 50, 158, ¶ 50. Mr. Jones did not notice any residue on the handlebar or grip. ECF No. 142, ¶ 51, 158, ¶ 51. Prior to this accident, Plaintiff and Tom Jones were not aware the ATV had been involved in any other accidents.[3] ECF No. 142, ¶ 21, 158, ¶ 21. After the incident, Plaintiff was diagnosed by his therapist with Post-Traumatic Stress Disorder. ECF No. 142, ¶ 54, 158, ¶ 54.

SMAC's current process for assembling ATVs involves multiple stations or teams. ECF No. 114, ¶ 33, 141, ¶ 33. The handlebar, including the grip, is assembled with Team One. ECF No. 114, ¶ 34, 141, ¶ 34. The grips on the ATVs are adhered to the handlebars with glue during

---

[3] Plaintiff's fact states the ATV had never been in an accident. However, the cited deposition testimony only supports that Tom Jones and Plaintiff were unaware of any prior accidents.

assembly. ECF No. 114, ¶ 35, 141, ¶ 35. The glue used to attach the grips on the Subject ATV, as well as on other model ATVs since SMAC opened in approximately 2002, was TB1521. ECF No. 114, ¶ 36, 141, ¶ 36.[4]

On July 26, 2012, SMAC issued an engineering change request to SMC for the glue for the handlebars. ECF No. 142, ¶ 59, 158, ¶ 59. The reason for the glue change, as stated in the ECR, was "Current glue (ThreeBond 1521) does not hold well to EPDM rubber grips. Proposed glue (3M 4799) bonds to EPDM rubber. 3M 4799 is also black, making glue relatively unnoticeable against grip and handlebar." ECF No. 142, ¶ 61, 158, ¶ 61. On May 23, 2013, SMC issued an Engineering Change Notice for SMAC to change from using TB1521 glue to 3M-4799 glue, which SMAC started using on the production line in mid-August 2013. ECF No. 114, ¶ 36, 141, ¶ 36. This was a running change, meaning Suzuki decided to use up the remainder of the TB1521 glue before implementing the change. ECF No. 142, ¶ 62, 158, ¶ 62. Suzuki did not send any notice to any owners or dealers of ATVs concerning TB1521. ECF No. 142, ¶ 65, 158, ¶ 65.

The procedure for applying the TB1521 glue to the grips was addressed in SMAC's Operation Standard Work documents. ECF No. 114, ¶ 37, 141, ¶ 37. Beginning June 22, 2012, the TB1521 glue was first applied inside the grip using a brush and then applied around the end of the handlebar.[5] ECF No. 114, ¶ 37, 141, ¶ 37. The grip is then slid onto the handlebar. ECF No. 114, ¶ 38, 141, ¶ 38. SMAC has never used any kind of mechanical securing device to hold grips to handlebars.[6] ECF No. 142, ¶ 16, 158, ¶ 16. Prior to the sale of the subject ATV, SMAC did not conduct any tests to determine how much force, if any, it takes for grips to come off of

---

[4] The parties dispute how much TB1521 glue, if any, was used on the grips of the Subject ATV.
[5] Plaintiff asserts there is no evidence this policy was followed for the Subject ATV.
[6] In this fact, Plaintiff refers to Suzuki. The Court has changed it to state SMAC because that is what the cited deposition testimony supports.

handlebars.[7] ECF No. 142, ¶ 17, 158, ¶ 17.

During the assembly process, each team inspects the work performed at their respective station before the ATV goes to the next team's station. ECF No. 114, ¶ 39, 141, ¶ 39. During the process, the grips are inspected by Team One and Team Two. ECF No. 114, ¶ 40, 141, ¶ 40. Once assembly is complete, the ATV proceeds to the Quality Control Department where the grips are inspected and twisted to see if there is any movement or play.[8] ECF No. 114, ¶ 41, 141, ¶ 41. If there is any movement in the grip, the ATV is placed to the side to sit overnight. ECF No. 114, ¶ 42, 141, ¶ 42. If the next morning there is still movement in the grip, an entirely new grip is installed, which involves removing the old grip with degreaser and a screwdriver. ECF No. 114, ¶ 42, 141, ¶ 42.

The ATV then moves to the second quality control inspection step where a line operator sits on the ATV and runs it on a machine at certain speeds. ECF No. 114, ¶ 43, 141, ¶ 43. The operator will grip the handlebars and check for any movement. ECF No. 114, ¶ 43, 141, ¶ 43. If there is any movement, the ATV will be placed on the side to sit overnight and go through the same procedure as during the previous phase. ECF No. 114, ¶ 43, 141, ¶ 43.

For each ATV manufactured at SMAC, a document entitled Final Inspection Check Sheet is prepared and used to evaluate the ATV at all stages of the assembly line. ECF No. 114, ¶ 44, 141, ¶ 44. An ATV cannot be packed and shipped from SMAC until it receives final approval stamps following inspection from both quality control inspection stations referred to above. ECF No. 114, ¶ 44, 141, ¶ 44. The final inspection check sheets for 1,000 model ATVs assembled prior to the Subject ATV do not reflect a grip either came off or was loose on any of the ATVs.

---

[7] In this fact, Plaintiff refers to Suzuki. The Court has changed it to state SMAC because that is what the cited deposition testimony supports.
[8] Defendants include in this fact this occurs 2.5 hours or more later. This is not supported by the deposition cited so the Court has not included it in the statement of uncontroverted facts.

ECF No. 114, ¶ 46, 141, ¶ 46. At no point in SMAC's history has anyone in the Quality Control Department ever seen a grip come off.[9] ECF No. 141, ¶ 47.

The Quality Control Team Leader will also perform a Global Customer Audit and a Daily Check. ECF No. 114, ¶ 48, 141, ¶ 48. The Quality Control Team Leader will randomly pull one out of 60 ATVs off of each line to inspect it. ECF No. 114, ¶ 48, 141, ¶ 48. This inspection involves taking off components to ensure the correct assembly of the ATV. ECF No. 114, ¶ 48, 141, ¶ 48. This inspection includes checking the grips for any movement. ECF No. 114, ¶ 48, 141, ¶ 48. For the Daily Check, the Quality Control Team Leader takes another completed ATV out of the 60 units assembled for another SMAC technician to perform another check similar to the Global Customer Audit. ECF No. 114, ¶ 49, 141, ¶ 49.

The Quality Control process for grips has been in place at SMAC since it began manufacturing in 2002. ECF No. 114, ¶ 50, 141, ¶ 50. Although there have been instances when the ATV got to the end of the assembly line where a grip had some movement or play, no one from SMAC has ever seen a grip just slide off a handlebar after glue has been applied at SMAC.[10] ECF No. 114, ¶ 50, 141, ¶ 50. Plaintiff's action is the only claim or lawsuit SMAC has ever received concerning allegations of a grip coming off the handlebars and causing injury on the Subject ATV being operated by Plaintiff.[11] ECF No. 114, ¶ 51, 141, ¶ 51. Of the 2,400 model year 2013 LT-F400FL3 ATVs manufactured by SMAC, SMAC has received no other claims or

---

[9] Defendants' fact states no one in SMAC's Quality Control Department has ever been able to physically remove a grip from the handlebar by twisting it. However, the cited deposition states "We have never ever seen a grip come off."
[10] Plaintiff disputes this fact by citing to four warranty claims submitted to SMAI. This does not dispute the fact submitted by Defendants that SMAC has never seen a grip slide off the handlebar.
[11] Plaintiff disputes this fact stating SMAC does not handle warranty disputes. However, this does not make the fact untrue. Plaintiff also states SMAC was aware of one of the warranty claims but in the cited deposition testimony, the witness states he only became aware of the warranty claim, because it was produced by another party in this litigation.

lawsuits concerning grips coming off the handlebars and causing an injury.[12] ECF No. 114, ¶ 52, 141, ¶ 52.

## II. STANDARD

A court shall grant a motion for summary judgment only if the moving party shows "there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By definition, material facts "might affect the outcome of the suit under the governing law," and a genuine dispute of material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The moving party bears the initial burden of proof in establishing "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the moving party meets this initial burden, the non-moving party must then set forth affirmative evidence and specific facts demonstrating a genuine dispute on the specific issue. *Anderson*, 477 U.S. at 250. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing a genuine dispute of material fact exists. Fed. R. Civ. P. 56(c)(1); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). The non-moving party must demonstrate sufficient favorable evidence that could

---

[12] Plaintiff disputes this fact for the same reasons as the last fact. For the same reasoning, the Court finds it is undisputed.

8

enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.* The Court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).

## III. DISCUSSION

In their motions for summary judgment, Defendants argue Plaintiff's strict liability manufacturing and design defect claims and negligence claims fail because he lacks admissible evidence to establish a defect that actually caused his injuries. Consequently, Defendants state Plaintiff also cannot establish punitive damages.

### A. *Manufacturing and Design Defect Claims*

To establish a strict products liability claim, a plaintiff must prove: (1) the defendant transferred a product in the course of his business; (2) the product was used in a manner reasonably anticipated; and (3) either the product was in a defective condition, unreasonably dangerous when put to a reasonably anticipated use and the plaintiff was damaged as a direct result of the defective condition as existed when it was sold or the product was unreasonably dangerous when put to reasonably anticipated use without knowledge of its characteristics and

9

the plaintiff was damaged due to the lack of an adequate warning on the product. Mo. Rev. Stat. § 537.760. The plaintiff bears the burden to show the product was defective and the defect caused the plaintiff's injury. *Pritchett v. Cottrell, Inc.*, 512 F.3d 1057, 1063 (8th Cir. 2008). The fact of an injury alone is insufficient to prove a product was unreasonably dangerous. *Bachtel v. TASER Intern., Inc.*, 747 F.3d 965, 973 (8th Cir. 2014).

Defendants argue Plaintiff fails to offer any evidence of a defect in the Subject ATV, a defect proximately caused his injuries, or a failure to warn proximately caused his injuries. According to Defendants, because Plaintiff cannot establish an actual defect, he cannot establish proximate cause and he cannot establish Defendants failed to warn of a danger that has not been proven to exist. Defendants repeatedly assert evidence of an injury is not evidence of a defect. However, Plaintiff has submitted evidence of an actual defect, separate and apart from his injury. The actual defect is the grip coming off the handlebar. The evidence submitted by Plaintiff that the grip came off the handlebar includes the testimony of Plaintiff, Mr. Jones, and J.J., who all state they saw the grip not attached to the handlebar. When the grip came off, how it came off and whether it could have been prevented are all factual issues in dispute. Plaintiff has submitted sufficient evidence to create a material factual dispute of an actual defect to survive summary judgment.

Defendants also argue to establish an actual defect Plaintiff needs expert testimony and Defendants have challenged Plaintiff's experts pursuant to Federal Rule of Civil Procedure 702 in their separately filed Motions to Exclude Experts. Thus, Defendants' argument is after the experts are dismissed pursuant to their motions, Plaintiff will have no way to establish an actual defect in the Subject ATV. The Eastern District of Missouri has dismissed and the Eighth Circuit has upheld dismissals of cases after experts have been dismissed finding the plaintiff cannot

establish a defect without the expert, but it is not a requirement. *See Shaffer v. Amada America, Inc.*, 335 F. Supp. 2d 992,998 (E.D. Mo. 2003) ("Without expert testimony, we are left with evidence of an accident. The fact that an accident happened, standing alone, does not establish a case of product defect."); *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1111 (8th Cir. 2007) (finding Missouri law does not require expert testimony unless "the lay jury does not possess the experience of knowledge of the subject matter sufficient to enable them to reach an intelligent opinion without help.").

In *Shaffer*, the product at issue was a press brake machine that crushed the plaintiff's fingers when the machine cycled upward. 355 F. Supp. 2d at 993. The district court held expert testimony to establish the defect was required because it involved "a complex piece of industrial machinery." *Id*. at 998. Similarly, in *Menz*, the product was a front-end loader tractor that rolled over onto the plaintiff requiring amputation of his left arm. 507 F.3d at 1109. The Eighth Circuit required expert testimony, holding "the products at issue in this case are fairly technical and complex, and are not the type of machinery commonly utilized by the typical lay juror." *Id*. at 1112. These cases are unlike the case presently before the Court. Here, the product at issue is an ATV, with which many lay jurors have had experience. Further, the defect concerns a simple handlebar grip, not a complex subject such as the engine.

Whether or not the ATV was defective when the grip came off is something a lay juror can determine without the help of an expert. Defendants present the case as involving complex industrial manufacturing and design processes, crash dynamics and kinetics. But the evidence submitted to the Court with this motion shows otherwise. Attachment of the grip to the handlebar required an individual to brush glue on the handlebar and slide the grip onto it. This is not a complex industrial manufacturing process. The accident itself also is not complex. Common

sense allows the jurors to determine if Plaintiff was driving too fast through the creek, or mishandled the ATV in some way. Plaintiff does not need experts to present his case to the jury.

Because Defendants' arguments about causation are predicated on the absence of an actual defect, these arguments fail as well. Defendants' motion on these points will be denied.

B.     *Failure to Warn Claims*

Missouri recognizes a manufacturer has a duty to warn users of its products which are inherently dangerous or dangerous because of the use to which they are put. *Spuhl v. Shiley, Inc.*, 795 S.W.2d 573, 579 (Mo. Ct. App. 1990). In order to prevail on a strict liability failure to warn theory, Plaintiff must establish Defendants sold the Subject ATV in the ordinary course of business, the Subject ATV was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics, Defendants did not give adequate warning of the danger, the product was used in a reasonably anticipated manner and Plaintiff was damaged as a result of the Subject ATV being used without an adequate warning. *Tuttle v. Steris Corp.*, No. 4:12-CV-1487 CEJ, 2014 WL 1117582 at *6 (E.D. Mo. Mar. 20, 2014). To establish causation, Plaintiff must show the Subject ATV caused Plaintiff's injuries and he must show a warning would have altered his behavior. *Id*. Under Missouri law, there is a rebuttable presumption a warning will be heeded. *Menz*, 507 F.3d at 1112. This presumption arises when there is sufficient evidence the plaintiff did not know of the specific danger involved. *Id*.

In a negligence failure to warn claim, a plaintiff must show the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform this duty and the defendant's failure resulted in injury to the plaintiff. *Bachtel v. Taser Intern. Inc.*, No. 2:11-CV-00069 JCH, 2013 WL 317538 at *7 (E.D. Mo. Jan. 28, 2013) (citing *Smith v. Brown & Williamson Tobacco*

*Corp.*, 275 S.W.3d 748, 800 (Mo. Ct. App. 2008)). Missouri law requires a plaintiff to make the same showing of proximate cause under negligence as under strict liability. *Id*.

Defendants assert Plaintiff has failed to show the Subject ATV caused the injury and he has failed to show a warning would have altered the behavior of those involved in the accident. Defendants' causation argument again rests on the argument Plaintiff has not established an actual defect. Because the Court addressed this issue *supra*, it will not address it again.

Plaintiff has presented no evidence he would have heeded a warning had it been given. In fact, the evidence shows Plaintiff most likely would not have heeded a warning because he did not follow the warnings that were given; he was not wearing a helmet, was under the age of 16, and had a passenger on the ATV.

Missouri law states a rebuttable presumption arises when there is sufficient evidence the plaintiff did not know of the specific danger involved. *Menz*, 507 F.3d at 1112. The rebuttable presumption assumes a reasonable person will act appropriately if given adequate information. *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 785 (Mo. Ct. App. 2008). For the presumption to apply, there must be a legitimate jury question whether the plaintiff knew of the specific danger that caused the injury. *Id*. The term "presumption" means "makes a prima facie case, i.e., creates a submissible case that the warning would have been heeded." *Id*.

Plaintiff has not submitted sufficient evidence he did not know of the specific danger involved, specifically whether the grip could come off of the ATV. There are no facts submitted to support his lack of knowledge of the risk of the grip coming off the handlebar. The only evidence Plaintiff raises to show he did not have knowledge of the risk is that Mr. Jones testified "he got the grips replaced immediately after the incident to ensure the safety of his family and to make sure this never happened again." This does not show Plaintiff did not know of the specific

danger involved. Therefore, the rebuttable presumption does not apply. Without the rebuttable presumption, Plaintiff has not shown a warning would have altered his behavior. Thus, Plaintiff cannot establish causation and his claims for failure to warn, under both negligence and strict liability theories, fail. These claims will be dismissed.

    C.    *Negligence Claims*

Defendants assert Plaintiff's negligence claims against SMAC should be dismissed because Plaintiff fails to product competent evidence to establish the claim. Defendants argue Plaintiff has failed to introduce evidence of a defect in the Subject ATV and Plaintiff has failed to show the alleged defect in the gluing of the subject grip caused his injuries. Defendants' causation argument rests on the principle that because Plaintiff cannot show evidence of a defect, he cannot show evidence of causation.

To establish negligence, as stated above, Plaintiff must show Defendant SMAC owed him a duty of care, SMAC breached that duty, and Plaintiff suffered an injury proximately caused by SMAC's breach. *Pippin v. Hill-Rom Co., Inc.*, 615 F.3d 886, 889 (8th Cir. 2010). The Court has already addressed Defendants' arguments Plaintiff has not established a defect and determined there are material facts in dispute about the existence of a defect. This analysis does not change because the claim is under a negligence theory rather than strict liability. Therefore, the Court will deny Defendants' motion as to negligence.

    D.    *Punitive Damages*

Defendants argue Plaintiff cannot recover punitive damages where he has failed to establish his underlying claims of strict liability and negligence. This argument fails because the Court has determined Plaintiff has created disputes of material fact as to whether Defendants are liable. Second, Defendants argue Plaintiff's punitive damages claim should be dismissed because

he cannot prove Defendants' outrageous conduct due to evil motive or reckless indifference to the rights of others by clear and convincing evidence. According to Defendants, Plaintiff has failed to produce evidence Defendants knew of any actual defect in the Subject ATV, Defendants' knowledge of prior similar occurrences, the absence of negligence on the part of anyone else or a knowing violation of a statute, regulation, or industry standard. All of these are factors in determining if punitive damages should be awarded.

Punitive damages are submitted in a strict liability case if there is clear and convincing evidence the defendants placed into commerce an unreasonably dangerous product with actual knowledge of the product's defect. *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 24 (Mo. Ct. App. 2006). In a negligence case, punitive damages are submitted when the defendant knew or had information from which he should have known the alleged negligent conduct created a high degree of probability of injury showing complete indifference or conscious disregard for the safety of others. *Coon v. Am. Compressed Steel, Inc.*, 207 S.W.3d 629, 637 (Mo. Ct. App. 2006). Under both negligence and strict liability theories, the plaintiff must show the defendant exhibited a complete indifference to or conscious disregard for the safety of others. *Jone v. Coleman Corp.*, 183 S.W.3d 600, 610 (Mo. Ct. App. 2005).

Conscious disregard or complete indifference means the person doing the act is conscious from the surrounding circumstances their conduct will naturally or probably result in injury. *Peters*, 200 S.W.3d at 24. "The clear and convincing standard requires evidence which instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proposed." *Coon*, 207 S.W.3d at 637. Factors to consider in weighing submission of punitive damages are if there are prior similar circumstances known to the defendant, if the event was likely to have occurred

absent negligence on the part of someone else, and if the defendant knowingly violated a statute, regulation or clear industry standard designed to prevent the injury that occurred. *Lopez v. Three Rivers Elec. Co-op, Inc.*, 26 S.W.3d 151, 160 (Mo. 2000).

There are material facts in dispute regarding punitive damages that prevent the Court from dismissing Plaintiff's punitive damages claim. Whether Suzuki knew of the defect and whether Suzuki's failure to conduct testing constitutes conscious disregard are two of the issues. Plaintiff has submitted facts suggesting Suzuki knew the glue was not adhering to the handlebar and the grip. Defendants assert the same evidence shows Suzuki made a glue change but not because the glue was not adhering. This is a question to be determined by the jury, not the Court. Because of the disputed material facts, the Court will deny Defendants' Motion for Summary Judgment for punitive damages.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Suzuki Manufacturing of America Corporation and Suzuki Motor Corporation's Motion for Summary Judgment on All Counts of Plaintiff's Amended Complaint [110] is **GRANTED, in part,** and **DENIED, in part.** Plaintiff's failure to warn claim against Defendants SMAC and SMC is **DISMISSED**, with prejudice.

**IT IS FURTHER ORDERED** that Defendants Suzuki Manufacturing of America Corporation and Suzuki Motor Corporation's Motion for Summary Judgment on the Issue of Punitive Damages [115] is **DENIED**.

Dated this 14th Day of August, 2018.

*/s/ E. Richard Webber*

_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE